John Brown's Assigned Estate.    Appeal of J. B. Green.

*Assignment for creditors—Continuance of business by assignee—Surcharge.*

An assignee for creditors may, for good reasons, continue the assignor's business a reasonable length of time for the purpose of completing the manufacture of unfinished goods, with a view of enhancing their value, but if he continues the business generally for a longer period, and it results in a loss, he does so at his own risk, and he must account for the loss.

Where an assignee for creditors, without the consent of the creditors, pays out of funds in his hands a balance of purchase money due by the assignor for real estate, and subsequently sells the land for a sum less than the balance of the purchase money which he had paid, he will be surcharged with the difference.

Argued Oct. 10, 1899.   Appeal, No. 69, Oct. T., 1899, by J. B. Green, from order of C. P. Cambria Co., sustaining exceptions to report of auditor.   Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and FELL, JJ.   Affirmed.

Exceptions to report of auditor, Jacob Zimmerman, Esq.

The facts appear by the following opinion of LOVE, P. J., of the 49th judicial district, specially presiding:

The exceptions filed to the auditor's report disposing of the exceptions to the account of Dr. J. B. Green, assignee of John Brown, restating the account and reporting distribution, while being some thirteen in number, yet upon the argument the questions principally pressed were that the accountant should be surcharged with the commission, attorney's fees, loss sustained on a portion of the real estate designated as the Mineral Point property, and for expenses incurred in continuing a portion of the business for some three years at an alleged loss to the estate, and for which several items, as well as commissions, attorney's fees, etc., he has taken credit in his account.

John Brown, the assignor, and wife executed a deed of voluntary assignment to Dr. J. B. Green, September 11, 1893, who accepted the trust. The assigned estate consisted of a stock of general merchandise, furniture and furniture manufactory, sawmill and several pieces of real estate. An appraisement of the property was duly had and the personal property appraised as follows, to wit: furniture, store goods, etc., machinery, $7,518.95, and book accounts and judgments, $2,216.86, making a total of $9,735.81. The evidence shows that some of the furniture was partially manufactured and in an unfinished condition. But the evidence does not show what proportion of it was in such condition. It would seem though from statements made by counsel in the argument of the case, and from a careful examination of the evidence, that the unfinished product was not carefully set out as such when the inventory and appraisement was made; neither are we advised from the evidence as to the exact amount at which the store was appraised. The evidence shows that the assignee, at the suggestion of the assignor, continued to run the mercantile business generally for a period of five or six months, and afterwards opened the store when anything was wanted; that the assignee, at the request of the assignor, continued to run the furniture manufactory, to finish up the unfinished furniture, and made some new, lumber, etc., bought by the assignee for that purpose, and was continued up until some time in 1896, when the personal assets were finally closed out. The account of the assignee shows that he paid for materials for carrying on the business, traveling

expenses, commissions on sales, etc., relative to the store and furniture business the sum of $2,624.45; the total amount realized from the sale of furniture, store, machinery, etc., out of the personal assets was as follows: from the furniture, $2,170.81; from store, $1,363.80; from machinery, $282.05; from book accounts, $453.57, and miscellaneous sources, $39.20. Then the auditor surcharged the accountant with $291.82, making the gross proceeds of the personal assets amount to the sum of $4,601.19. As against this sum the assignee claims credit for $2,624.45 expenses, etc., for running the business, and $250 for counsel fees, making in all the sum of $3,224.45, and leaving a net balance out of the personal assets of $1,376.74, which is about the amount of proceeds realized out of the store alone.

It is very evident that the continuance of the business resulted in considerable loss to the estate. While an assignee may be justified in using up material necessary to finish unfinished articles of furniture or other manufactured products, yet it must be with a view of enhancing their value. Had the assignee in this case, when he found the condition of the unfinished product, called a meeting of the creditors and consulted with them, and ascertained the probable cost and length of time it would involve to finish the product so as to make it more salable, and their consent had to what was done, it would have relieved him from the difficulties now confronting him, but that was not done, and he was perhaps overpersuaded by the assignor. If we assume the store shortly after the assignment would have realized near the sum finally realized out of it, say $1,200, and the books and notes, etc., the sum of $453.51, the machinery $282.05, and the furniture, appraised at several thousand dollars, say $1,100, the personal estate would have yielded the sum of $3,035.26 practically for distribution, less reasonable commission, attorney's fees and expenses. Under all the evidence adduced it would seem clear that there is a shrinkage of at least $1,000 or $1,200 in the personal assets, the result of the management of the estate. The evidence, however, fails to show any wilful mismanagement on the part of the assignee. We think he was impressed with the idea that more could be realized by running the business, and that he was overpersuaded by the assignor. And, as we above stated, an assignee may for certain good reasons continue the business a reasonable

length of time for the purpose of finishing unfinished manufac-
tured goods, yet if he continues the business generally for a
longer period, and it results in loss, he does so at his own risk,
and must account. In this case we think the assignee was neg-
ligent. He should have known within a few months whether
the operation he was conducting as to the store and furniture
manufactory would increase or diminish the assets. He was
selling the product of the factory at retail or wholesale, had
his men traveling to make sales, and allowing them expenses
and commissions for so doing, and conducted the business gen-
erally for a period of three years with the result above shown.

The evidence, however, is somewhat indefinite, and it is dif-
ficult to determine therefrom just what loss was sustained.
That the work done on the unfinished furniture enhanced its
value to some extent and made it more salable is evident, and
to do equity between the parties is rather difficult under all the
evidence adduced in the cause. We think, perhaps, under all
the circumstances, it will be sufficient to deprive him of any
commissions so far as the personalty is concerned, and not
allow him more than $50.00 as counsel fees so far as the per-
sonalty is concerned, and we will surcharge him with the sum
of $500 on the personalty side of his account.

The exceptions as to the proceeds realized out of the real
estate are principally to the assignee's commissions, attorney's
fees and loss sustained on what is designated as the Mineral
Point property. The real estate assigned as a whole was ap-
praised at $11,194.58, and the gross proceeds realized out of
the same was $7,316.53. As against this sum the assignee
claims credit for a payment to Cambria Iron Company on
Mineral Point property of balance of purchase money, $1,998.64,
and taxes, repairs, etc., including commissions and attorney
fees, $1,786.20, making a total of $3,784.84, leaving for distri-
bution the sum of $3,531.16. First, we will consider the trans-
action as to the Mineral Point property. The evidence shows
that the assignor was the equitable owner of it under articles
of agreement. Just what amount of purchase money had been
paid by the assignor does not appear, nor is it material to the
question before us. At the time of the assignment he was in
the possession of the property, and had been for a long time
before, and was receiving the rents and income from the same.

After the assignment the assignee came into possession of the same and received the rents and income thereof. Some time after the assignment, the time does not appear definitely from the evidence, perhaps a year or more, the Cambria Iron Company were making inquiry as to the balance of the purchase money, and rendered a statement that the balance due was some $400 or $500 less than it was subsequently ascertained the real amount was. The assignee, however, without consulting creditors and without authority from them or any one, paid to the Cambria Iron Company the sum of $1,998.64, the balance of the purchase money claimed to be due on the Mineral Point property, to procure the legal title thereto. Then when he came to make sale of the property he sold the same with legal and equitable title for the sum of $1,400 or $598.64 less than he, as assignee, had paid for only the legal title, a good portion of the original purchase money having been paid before he paid said balance of $1,998.64. The auditor found that the action of the assignee in this matter was unauthorized and unwarranted in law, and then proceeds to adjust it by charging the assignee with the proceeds of sale, $1,400, and with the rents realized from the property, and crediting the assignee with amount he paid, and with taxes and repairs, showing that what the assignee paid, including taxes and repairs, exceeds the amount realized from the sale and the rents some $53.15, with which amount he surcharges the assignee. That the transaction was a gross disregard of the duties of an assignee is clear, and if advised by counsel that he had the right to do so, then he was erroneously counseled. The assignee came into possession of the property and of the receipts of the rents and income thereof immediately after the assignment in 1893. When he paid the balance of purchase money to the Cambria Iron Company does not appear, but we gathered from the evidence and the argument of counsel that it was over a year after the assignment. Now, there is nothing in the evidence to show that the assignee would not have received from the Mineral Point property substantially the same amount of rent he did receive whether he had paid the balance of the purchase money or had not paid it. He already had received quite a considerable rent before he paid the $1,998.64. This being so, to allow him credit for the money he wrongly invested, surely he cannot off-

set as against a direct loss, rents and income, a considerable portion of which he had already received from the property before he misapplied the funds of the estate, and so far as the evidence shows he would or might have received fully as much had he not made this wrongful investment. To be exceedingly charitable in the adjustment of this transaction, we think the assignee, under all the facts and circumstances, about which there is little or no dispute, should be surcharged at least with the $598.64, being the difference he realized less from the sale of the property than he paid of the assigned estate's funds for it. As to the question of counsel fees, we have considered the evidence carefully. So far as the personalty is concerned there seem to have been but little legal professional services required. And as to the real estate, the services were of the ordinary work pertaining to assigned estates, such as procuring order of sale for real estate and the orders of sale enlarged and continued several times, and making out of some eight or nine assignee deeds. There was no litigation of any consequence, only such as has arisen upon exceptions to the administering the affairs of the assigned estate. As to any compensation for counsel fees as to the Mineral Point property, none should be considered, either as to the sale thereof or the making of deed therefor. After considering the case fully, we are of the opinion that if the assignee is allowed out of the assigned estate the sum of $250 for counsel fees, it is a very liberal allowance for counsel fees as to the realty. As to assignee's commissions, if we were to limit him to the ordinary rule, it would be two and one half per cent on the sums realized out of the property. We, however, think that out of the real estate assets we will allow him commissions of $250. Assignees and counsel thereof should realize that assigned estates for the benefit of creditors are made in trust for the creditors and assignor, and where the estate is largely insolvent, as is this one, it is especially in trust for the creditors, and are not to be unnecessarily prolonged in their settlement, and minimized for the benefit of the assignee and counsel concerned. The assignee is a trustee, and subject to the good faith and responsibilities as such. The exception to the auditor's fee we dismiss, because the evidence fails to show definitely the exact time employed. The report is voluminous, and a good deal of testimony taken. The restatement

of the account, and the long pro rata distribution, and making out of the report was accompanied with a great deal of labor. We, however, will exact of the auditor the duty of making a pro rata distribution in accordance with our decree, without additional compensation. Then for the purposes of distribution, we decree the following balances, which are the balances found by the auditor after deducting the expenses of the audit, with the surcharges we have made added thereto:

| | |
|---|---|
| To balance of the personal assets as found by the auditor, less expenses of audit, . | $1,255 02 |
| To surcharge of commissions of assignee, . | 250 00 |
| To surcharge of counsel fees, . . . | 250 00 |
| Amount of personalty for distribution, without further deductions, . . . | $1,755 02 |
| Balance of real estate fund as found by auditor, less expenses of audit, . . . . | $3,265 84 |
| To error in calculating amount of sale of real estate, . . . . . . . | 25 00 |
| To surcharge loss on Mineral Point property, | 598 64 |
| To surcharge on assignee's commissions, . | 100 00 |
| To surcharge attorney fees allowed, . . | 100 00 |
| Balance of realty assets for distribution without further deductions, . . . | $4,089 48 |

The exceptions are sustained to the extent as set forth in the foregoing opinion and statement, and the other exceptions overruled and dismissed.

*Error assigned* was in sustaining exceptions to auditor's report.

*Wm. H. Sechler*, with him *Thomas J. Itell*, for appellant.—An assignee cannot be held accountable for errors of judgment: Schofield & Son's Est., 167 Pa. 481; Dillebaugh's Est., 4 Watts, 177; Hughes' Minors' App., 53 Pa. 500; Neff's App., 57 Pa. 91; Derbyshire's Est., 81 Pa. 18.

On the whole, taking into consideration the vast responsibility assumed by the assignee, the great amount of labor, time and attention he gave to this estate, he should not be de-

prived of his compensation : Wistar's Est., 192 Pa. 289; Horan
v. Ellis, 41 Pa. 470.

*Alvin Evans*, with him *S. L. Reed*, for appellees, cited Patton's Est., 2 Parsons, 103 ; Stehman's App., 5 Pa. 413 ; Millingar v. Hartupee, 53 Pa. 369; Beeter's Est., 12 Lanc. Bar. 159; Breneman's Est., 150 Pa. 494.

PER CURIAM, October 23, 1899:

We find no error in this record that would justify a reversal or modification of the decree ; nor is there anything in either of the specifications of error that requires discussion.   The correctness of the decree and the rulings of the court leading up thereto are so fully vindicated in the clear and exhaustive opinion of the learned president of the 49th judicial district, who specially presided at the hearing, that we find it unnecessary to add anything to what he has so well said.   On that opinion the decree is affirmed and appeal dismissed at appellant's costs.